374 So.2d 1316 (1979)
GENERAL ELECTRIC CREDIT CORPORATION, a corporation,
v.
ALFORD & ASSOCIATES, INC., a corporation, and Fred B. Alford.
77-272.
Supreme Court of Alabama.
April 6, 1979.
As Modified On Rehearing September 7, 1979.
*1318 John B. Givhan of Albrittons & Givhan, Andalusia, Albert E. Ritchey of Ritchey & Ritchey, Birmingham, Euel A. Screws, Jr. of Hobbs, Copeland, Franco & Screws, Montgomery, for appellant.
Earl V. Johnson, Andalusia, Jack Crenshaw, Joe T. Booth III, Montgomery, for appellees.
PER CURIAM.
General Electric Credit Corporation, Appellant, initiated this lawsuit by filing a three-count complaint against Alford & Associates, Inc., and Fred B. Alford, Appellees. On the first count for detinue, claiming nine mobile homes, the jury returned a verdict for G.E.C.C., assessing a total of $19,400 as the alternate value of the mobile homes and awarding damages of $6,570 for wrongful detention. On the second and third countsfor $17,889.47 under a wholesale financing agreement and for $50,537.11 under a retail financing agreementthe jury returned a verdict in favor of Appellees.
Appellees filed their answer and counterclaimed for loss of business, libel, and for money had and received. The jury found for Appellees on all three counterclaim counts, assessing damages against G.E.C.C. as follows: 1) $1.00 for loss of business; 2) $1.00 nominal damages and $65,000 punitive damages for libel; and 3) $23,569.91 on the claim for money had and received, which the trial Court, on order of remittitur, reduced to $12,006.80.

I. The Facts
In 1971, Alford started a mobile home sales business. G.E.C.C. contacted Mr. Alford and separate agreements were reached whereby G.E.C.C. would provide both wholesale and retail financing. The financing plans operate as follows:
Wholesale Plan: Alford would purchase a mobile home from the manufacturer and G.E.C.C. would lend money to cover both the purchase of the unit and the floor planning until Appellees sold the unit. The "wholesale financing agreement" was accompanied by a revolving credit promissory note. The wholesale agreement provides that G.E.C.C. is granted a security interest in all of Appellees' inventory now owned or hereafter acquired, together with all proceeds thereof, to secure payment of the Revolving Credit Promissory Note, or any other indebtedness or liabilities of Appellees, whether now existing or arising hereafter. G.E.C.C. contends that, at the time *1319 of this lawsuit, Alford owed $17,889.47 under the wholesale financing agreement.
Retail Plan: Because most mobile homes are sold on a time-payment basis, an agreement was reached between Appellees and G.E.C.C. whereby G.E.C.C. would purchase valid retail sales contracts from Appellees. The retail financing agreement provides for the establishment of reserves by G.E.C.C.
The agreement gives G.E.C.C. the right to establish "a time sales security reserve or such other reserve or reserves as [G.E.C.C.] deems necessary." These reserves are explicitly stated to be held as security for, and not in lieu of performance by Alford. Although the details of the reserve plan are not readily apparent from the record, it is clear that G.E.C.C. established two types of reserves: 1) a participating reserve and 2) deferred certificates.
In March, 1975, Alford made a demand, pursuant to the terms of the retail financing agreement, for an accounting of amounts charged to the participating reserve, and for an accounting (as well as demanding payment) of past-due deferred certificates. This statement, received May 1, 1975, showed a balance, but contained no breakdown of charges and credits and no payment of deferred certificates.
On June 1, 1975, Appellees received a monthly billing from G.E.C.C., showing the amount owed under the inventory financing account as of May 30, 1975. This statement, as later corrected, showed no previous unpaid installments due. It showed that $2,067.67 was currently due, and that the total amount owed by Appellees under the wholesale financing agreement was over $30,000. At this point, Appellees informed G.E.C.C. they were not going to pay G.E.C.C. on the wholesale agreement unless Appellees received an accounting and payment of any amounts due under the reserve provisions of the retail financing agreement.
On June 23, 1975, Alford received notice that the wholesale agreement was cancelled. Alford also received notice that several manufacturers would be notified to repurchase certain mobile homes that were financed under the wholesale financing agreement. At this point in time, G.E.C.C. mailed to Alford's suppliers, Champion Mobile Homes and Fair-Moore Mobile Homes, notices to repurchase the mobile homes held by Alford. In these notices, it was stated:
"Dealer continually fails to meet financial obligations to G.E.C.C."
Two of these notices contained a statement that merchandise had been repossessed. This, admittedly, was not true.
At the time the notices were sent, Alford claims that only $2,067.67 was owed by them to G.E.C.C. and that G.E.C.C. held $3,000 in matured deferred certificates under the retail plan; and, therefore, statements contained in these notices were false and libelous. G.E.C.C. asserts that Alford owed $17,889.47 and that nothing was owed by G.E.C.C. on the deferred certificates, because these were merely one form of reserves authorized by the retail financing agreement, payable at G.E.C.C.'s sole discretion.
Alford further contends that the amounts of $2,735.85 and $2,739proceeds from the sale of the "Hilton" and "Patrix" retail sales contractswere wrongfully withheld.[1] G.E.C.C. contends that these amounts, representing proceeds from the sale of inventory, were properly applied under the wholesale plan in reduction of Appellees' indebtedness to G.E.C.C. In other words, G.E. C.C. says that the amount of $17,889.47, the alleged debt of Appellees under the wholesale financing agreement, had already taken into account the proceeds of the "Hilton" and "Patrix" sales.

II. The Libel Claim
G.E.C.C. raises numerous issues concerning Appellees' right to recover under their claim of libel. There can be little doubt that, if untrue, the statement, "[d]ealer continually fails to meet financial obligations ....", and a statement to *1320 the effect that merchandise has been repossessed, are defamatory, and thus actionable, when published to Alford's suppliers. See, e. g., Harrison v. Burger, 212 Ala. 670, 103 So. 842 (1925) ("In many of the cases it is said that words charging nonpayment of debts or insolvency are actionable without special damage being shown, when they refer to merchants, tradesmen, or others in occupations where credit is essential.").
The initial inquiry, then, is whether the statements made by G.E.C.C. were, in fact, untrue. Mr. Bob Williamson testified as follows:
"Q. You made a false statement in there? All right. Now, typewritten in there, you put it in, `dealer continually fails to meet financial obligations to G.E.C.C.'. Now, this was at a time, wasn't it, when he owed you two thousand dollars ($2,000.00) and you owed him three thousand dollars ($3,000.00)?
"A. Right.
"Q. What obligation was it that you told his manufacturer he had continually failed to meet?
"A. Well, he was slow usually each month on paying the billing. Never really past due.
"Q. Mr. Williamson, your exhibit here or rather this exhibit, a statement of May twentieth, shows previous unpaid charges zero, doesn't it?
"A. Right.
"Q. This was the only statement he had at the date that you sent that, showed he had paid everything up to that May twentieth statement?
"A. Right.
"Q. All right. `The dealer continually fails to pay his obligations'. The only obligation he hadn't paid was this one of May the twentieth, wasn't it?
"A. At that time, yes, sir.
"Q. At that time? And at that time, you had in your possession at least three thousand dollars ($3,000.00) of his money on deferred certificates?
"A. Right.
"Q. That's got nothing to do with the fifteen thousand dollars on reserve. You had three thousand dollars ($3,000.00) of his money that you ought to have paid him on this same date and you never have paid him?
"A. Right."
This testimony unequivocally shows that at the time G.E.C.C. made the statements in question Alford had not continually failed to make its monthly payment, but had only failed to pay one monthly installment of $2,000 (the May billing), under the wholesale financing plan. The testimony further shows that its failure to pay was at a time when G.E.C.C.'s indebtedness to Alford, under the retail financing plan, was in an amount of $3,000, this debt accruing in the form of "matured deferred certificates."
Although arguments can be made as to G.E.C.C.'s duty vel non to offset its indebtedness to Alford (under the retail plan against Alford's indebtedness to G.E.C.C. (under the wholesale plan) before Alford could be declared in default, we find that the undisputed evidentiary support for the alleged falsity of other mattersthat "dealer continually fails to meet financial obligations" and that merchandise had been repossessedrenders unnecessary our further consideration of the offset issue.[2]
G.E.C.C. contends that, as a matter of law, it had a qualified privilege to make the communications to Champion and Fair-Moore because the statements were sent in the discharge of a legal right to protect their private interest and in furtherance of a legal duty owed to the manufacturers because they were required to repurchase their respective homes. G.E.C.C. asserts that the trial Judge erred in instructing the *1321 jury that they were to determine whether a qualified or conditional privilege existed in favor of G.E.C.C.
G.E.C.C. informed the trial Judge, in a conference prior to giving of the Court's instructions, that in its opinion the existence of a privilege should be determined as a matter of law. G.E.C.C. admits, however, that no objection was made to the Court's oral jury instruction after is was given and prior to the jury's retiring for their deliberations. G.E.C.C. contends that it was not required to strictly comply with ARCP 51 in that the purpose of the Rule, to give the trial judges an opportunity to correct any errors in the instruction, has been met by the earlier conference. The recent case of Odom v. Linsey, 365 So.2d 664 (Ala.1978) discusses in detail the necessity for, and manner of, compliance with ARCP 51. We hold, based on the authority of Odom, that G.E.C.C. has failed to properly preserve any error that might have been committed by the trial Judge in instructing the jury that they must determine the existence of any privilege in this case.[3]
G.E.C.C. contends that the trial Court erred in refusing to grant its motion for new trial, or, alternatively, its motion for judgment notwithstanding the verdict in that the dealer failed to show any proof of actual, special, or compensatory damages, and the jury returned a verdict of $1.00 nominal damages and $65,000 punitive damages. (The Court instructed the jury that, if they found for Appellees on the libel count, they could return a verdict of $1.00 nominal damages and punitive damages, if the publication was done maliciously.) G.E. C.C. also contends the amount of punitive damages was excessive. As to this latter contention, we agree.
It is G.E.C.C.'s contention that the present case should be decided according to the rule of the recent case of Bryan v. Brown, 339 So.2d 577 (Ala.1976). Bryan held that the law of defamation as enunciated in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), applies in cases involving defamation of private individuals whether a media or non-media defendant is involved.
Our review of the record shows that G.E. C.C. defended against the libel count only on the theory that it was entitled to the protection of a qualified privilege necessitating a showing of ill will before Appellees could recover. G.E.C.C. made no objection to the Court's charge for failure to instruct the jury as to the standards set forth in Gertz and Bryan. Not even in their motion for a new trial did G.E.C.C. specifically point out to the trial Court that Bryan and Gertz should control in the present case. G.E.C.C. cannot now be heard to complain of error which was not properly preserved.
Because Bryan and Gertz are not applicable (G.E.C.C. having failed to defend the libel count on the theory of those cases), we hold that Appellees were not required to show with specificity actual pecuniary losses, damages being presumed. We hold that punitive damages are recoverable, but that $65,000 punitive damages are excessive in this case. See Johnson Publishing Co. v. Davis, 272 Ala. 474, 124 So.2d 441 (1960).

III. G.E.C.C.'S Claim Under the Wholesale Agreement
G.E.C.C. claimed in Count Two of its complaint a breach by Alford of the terms and conditions of the wholesale financing agreement and the accompanying revolving credit promissory note. The terms of the promissory note provide that, on demand, the promissor agrees to pay G.E.C.C. $50,000, or the aggregate unpaid balance, with interest thereon at the rate of 7.5% per annum, payable monthly. The note also provides for reasonable attorney's fees if necessary for the collection of the note. The note was signed by Alford, both individually and on behalf of the dealership.
G.E.C.C. contends that at the time of bringing this action six mobile homes, under *1322 the wholesale financing plan, had not been fully paid for by Appellees. G.E.C.C. sought a money judgment for this balance in the amount of $17,889.47, together with interest and attorney's fees. The verdict of the jury and judgment was entered against G.E.C.C. on this count.
Upon carefully reviewing the record, we find that there is no evidence to support this aspect of the verdict; thus, judgment against G.E.C.C. is due to be reversed. The evidence shows unequivocally that, at the time of trial, Appellees had failed to pay the balance due on six mobile homes. Although there was some evidence of minor errors made by G.E.C.C. in its bookkeeping, the great preponderance of the evidence clearly establishes that, after correction of the error, the total amount owed by Appellees to G.E.C.C. was $17,889.47. For the error by the trial Court in denying G.E.C. C.'s motion for a new trial, or, its alternative motion for judgment n.o.v., this cause is remanded as to this aspect of G.E.C.C.'s claim.
Appellees do not seriously assert that they do not owe G.E.C.C. under the wholesale financing agreement; instead, they argue that the jury properly set off income earned by G.E.C.C. on the amounts held in reserve under the retail financing agreement. Appellees contend that the evidence shows that G.E.C.C. admittedly made profits of over 13% per annum on the reserve accounts without accounting to them for these profits. Because the reserves were generally in excess of $25,000, it is argued that over a four-year period the profits earned would offset the $17,889.47 owed under the wholesale financing plan.
Initially, it must be determined whether Appellees are entitled to profits which were admittedly earned on their monies held in reserve accounts. Section 7-9-102(1)(a), Ala.Code 1975, provides that, other than in two cases not here pertinent, Article Nine of the Uniform Commercial Code, dealing with secured transactions, applies:
"To any transaction (regardless of its form) which is intended to create a security interest in personal property . . . ."
The intent to create a security interest in the reserve funds is specifically spelled out in the retail financing agreement, wherein it is stated:
"It is agreed that such reserves are to be held as security for and not in lieu of performance."
Because the record shows a clear and unequivocal intention to create a security interest in personal property (i.e., money), we hold that this transaction is governed by Article Nine of the Uniform Commercial Code.
Section 7-9-207, Ala.Code 1975, provides in pertinent part:
"(2) Unless otherwise agreed, when collateral is in the secured party's possession:
". . .
"(c) The secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation;" (Emphasis added.)
While the retail agreement does not contain an "otherwise agreed" provision as to the duty to pay over profits or credit such profits to outstanding indebtedness at some point in time, the agreement does specifically provide in paragraph 9:
"... So long as any amounts owing on such Accounts by us [Appellees] or any Buyer shall be due and unpaid, or in the event of any breach of this agreement by us, any money, Accounts, or property of ours which may come into your possession may be held and later applied by you to any amounts so owing or which later become due ...."
The evidence is undisputed that Appellees currently have a contingent liability of over $400,000 under the retail financing agreement, this agreement being executory until such time as all retail sales contracts purchased by G.E.C.C. under the agreement have been liquidated by the various retail purchasers.
*1323 Therefore, in summary, the law is clear that G.E.C.C. must keep account of the profits they earn on funds belonging to Appellees which are held in reserve. When all outstanding accounts have been liquidated, it will be incumbent on G.E.C.C. to remit such profits to Appellees, after applying any necessary portion of such profits to reduce any amounts Appellees may owe to G.E.C.C. under the recourse provisions of the retail financing agreement. In conclusion, whatever rights Appellees may have to profits earned on the reserve funds (whether earned or to be earned), such profits cannot currently be used as a set-off against amounts Appellees owe under the wholesale financing agreement; nor will such "earned profits" currently support an independent action.[4]

IV. Claim for Money Had and Received
On the Defendants' counterclaim for money had and received, the jury returned a verdict in favor of the Defendants in the amount of $23,569.91. The trial Court ordered that this be remitted to a judgment of $12,006.80. Appellees contend that the following amounts were owed to them by G.E.C.C.:

(1) Interest overcharge $ 1,400.00
(2) Hilton and Patrix Contracts 5,474.85
(3) Florida Sales Tax 1,248.45
(4) Commitment Fees 300.00
(5) Credit Life Premiums 487.50
(6) Past due deferred certificates 3,096.00
 __________
 TOTAL $12,006.80

G.E.C.C. first contends that, under the reserve provisions of the retail financing agreement, no amount of reserves could be recovered under a claim for money had and received because the agreement made reserves payable only at G.E.C.C.'s sole discretion. The testimony of Bob Williamson, as set out in Part II of this opinion, affirmatively proves that over $3,000 in deferred certificates had matured and were presently owing to Appellees. G.E.C.C. cannot now be heard to complain that they really did not owe these amounts to Appellees.
G.E.C.C. also contends that the proceeds from the sale of mobile homes to the Hiltons and Patrixes were retained by them and applied against the indebtedness under the wholesale financing agreement and the accompanying revolving credit note, in order to reduce the outstanding indebtedness to the amount of $17,899.47 under its claim on the wholesale agreement and note. This, it asserts, was proper under the terms of the wholesale financing agreement which explicitly entitled them to retain a security interest in the inventory of mobile homes and any proceeds thereof.
We have carefully reviewed the record in this case; and we hold that the great preponderance of the evidence supports G.E.C.C.'s claim that the proceeds of these two contracts have already been credited to Appellees and, therefore, cannot support Alford's count for money had and received. We further hold that the other amounts recovered by Appellees on the money had and received count were properly allowed.[5]

V.
We affirm the judgment in favor of Appellees on the counterclaim for money had and received, as reduced by the trial court, on the condition that Appellees file, within 28 days hereof, a remittitur in the amount of $5,474.85, so as to reduce the judgment to the sum of $6,531.95. Otherwise, the *1324 judgment on this aspect of the counterclaim is reversed, and the cause is remanded for a new trial.
We affirm the judgment on the counterclaim for libel on the condition that Appellees file, within 28 days hereof, a remittitur in the amount of $35,000 as to reduce the judgment to the sum of $30,000. Otherwise, the judgment on this aspect of the counterclaim is reversed, and the cause is remanded for a new trial. We reverse and remand as to G.E.C.C.'s claim under the wholesale agreement.
We have carefully reviewed the briefs and the record; and we find the other issues raised by Appellant to be without merit.
AFFIRMED ON CONDITION OF REMITTITUR, IN PART; REVERSED, IN PART; AND REMANDED.
TORBERT, C. J., and BLOODWORTH, MADDOX, JONES, ALMON, SHORES and EMBRY, JJ., concur.
FAULKNER and BEATTY, JJ., concur in part and dissent in part.
FAULKNER, Justice (concurring in part and dissenting in part).
I concur with the majority in all aspects of the opinion except that part of the opinion affirming the judgment on the libel counterclaim on condition that appellees file a remittitur. I would affirm that portion of the judgment below.
BEATTY, J., concurs.

On Rehearing
PER CURIAM.
In the original opinion in this cause, we addressed Appellees' contention that the evidence shows that G.E.C.C. admittedly made profits of over 13% per annum on the reserve account without accounting to Appellees for these profits and that these profits would more than offset the amount owed by Appellees under the wholesale financing plan. We stated that the initial issue is "... whether Appellees are entitled to profits which were admittedly earned on their monies held in reserve accounts."
We held that Code 1975, § 7-9-207, mandates that "unless otherwise agreed" any money representing an increase or profit from the collateral shall be remitted to the debtor or applied in reduction of the secured obligation. Furthermore, we found that while the retail financing agreement did not contain an "otherwise agreed" provision as to the duty to pay over or credit any profits at some point in time, the agreement was clear that it was executory until such time as all retail sales contracts purchased by G.E.C.C. were liquidated by the various retail purchasers.
On this issue we stated our holding thusly:
"... the law is clear that G.E.C.C. must keep accounts of the profits they earn on funds belonging to Appellees which are held in reserve. When all outstanding accounts have been liquidated, it will be incumbent on G.E.C.C. to remit such profits to Appellees, after applying any necessary portion of such profits to reduce any amount Appellees may owe to G.E.C.C. under the recourse provision of the retail financing agreement. In conclusion, whatever rights Appellees may have to profits earned on the reserve funds, (whether earned or to be earned), such profits cannot currently be used as a set-off against amounts Appellees owe under the wholesale financing agreement; nor will such `earned profits' currently support an independent action."
We did not mean to imply by out statement "... nor will such `earned profits' currently support an independent action" that Appellees were precluded from pursuing any contractual rights they might have to an accounting of all amounts held in reserve by G.E.C.C., including an accurate statement as to any profits earned to date on such amounts. Our holding on this point was only that there was no current right to payment of any profits earned. Nor did we intend to imply that G.E.C.C. was precluded in a subsequent hearing from proving factually that no profits were earned on these amounts held in the various reserve accounts.
*1325 This aspect of the case is further complicated by evidence in the record that: (1) the reserve accounts were established through accounting or bookkeeping entries on the books and records of G.E.C.C. as distinguished from an actual deposit of funds from Alford; (2) though credits to the reserve accounts were entered upon each sale by Alford, that credit represented an unearned rebate of a portion of the finance charge which was earned during the course of payments by the customer to G.E.C.C.; and (3) funds in the reserve accounts were not held in separate accounts so that profits, if any, could be accurately ascertained, but rather were commingled with the rest of G.E.C.C.'s funds. Clearly, G.E.C.C. could not earn profits on that portion of the reserve account which was unearned (i.e., not yet received from the customer), nor on that portion of the reserve account which had been paid in cash to Alford.
We do note that in its brief on rehearing, G.E.C.C. argues that a number of provisions in the retail agreement, when read together, show that there was no intention that G.E.C.C. account for and pay over for credit profits earned on reserves. We have carefully reviewed G.E.C.C.'s argument and the pertinent contract provisions, and we reaffirm our holding that the provisions do not amount to an express agreement that G.E.C.C. has no duty to credit or pay over profits earned on reserve. In other words, this does not meet the "unless otherwise agreed" provisions necessary to avoid the application of § 7-9-207, Ala. Code 1975.
Upon further consideration, the order of remittitur as to the libel claim is withdrawn and the judgment of $65,000 is reinstated and affirmed.
APPLICATION FOR REHEARING GRANTED AND OPINION EXTENDED AND MODIFIED.
All the Justices concur.
NOTES
[1] "Hilton" and "Patrix" are retail purchasers whose retail sales contracts were sold by Appellees to G.E.C.C under the retail financing plan.
[2] For an annotation on the duty to set off cross indebtedness before declaring the debtor in default, see 51 A.L.R. 1256; for an annotation on the duty to apply funds of the mortgagor in the hands of the mortgagee to the mortgagor's debt prior to declaring the mortgagor in default, see 80 A.L.R. 246.
[3] Particular note should be made of the fact that here we are not dealing with a "given" written requested charge to which an objection and grounds therefor have been previously registered.
[4] Because of the uniqueness of the posture of the record, we declined to accept a certified question from the United States District Court for the Middle District of Alabama in Civil Action No. 78-104-N relating to Alford's right, in a subsequent claim, to recover profits earned on the reserve account after November 26, 1975. We trust that our holding as to this aspect of the instant claim will serve also to assist the Federal District Court in its disposition of the pending claim between these parties.
[5] We recognize that in spite of the unequivocal language of paragraph 9 of the retail financing agreement, as set out in Part III of this opinion, certain funds such as sales tax overcharge, interest overcharge, commission fees and credit life premiums apparently were not treated, within the contemplation of the parties, as amounts that G.E.C.C. would hold until the liquidation of all outstanding retail sales contracts.