482 So.2d 1176 (1985)
GENERAL MOTORS CORPORATION
v.
Robert J. EDWARDS, et al.
Robert J. EDWARDS, etc., et al.
v.
GENERAL MOTORS CORPORATION.
83-489, 83-510.
Supreme Court of Alabama.
November 15, 1985.
*1179 Brittin T. Coleman and Norman Jetmundsen, Jr. of Bradley, Arant, Rose & White, Birmingham and Byron Attridge and Chilton Davis Varner of King & Spalding, Atlanta, Ga., for appellant/cross-appellee, General Motors Corp.
R. Ben Hogan III of Hogan, Smith, Alspaugh, Samples & Pratt, Birmingham, and George White, Gadsden, for appellees/cross-appellants.
MADDOX, Justice.
These appeals arise from an automobile accident resulting in the tragic deaths of two boys and severe burns to their parents. Most of the facts in this case were disputed at trial; from those not in dispute, we have distilled the following: On the night of April 18, 1981, Robert and Marion Edwards and their two sons, Kelvin, age seven, and Reginald, age six, were en route from Marion to Montgomery in a 1980 Chevrolet Chevette automobile, which Mr. Edwards had borrowed from his brother. Mr. Edwards drove; Mrs. Edwards rode in the right front passenger seat; Reginald lay on the rear seat, and Kelvin lay in the hatchback or trunk area immediately behind the rear seat. As the Chevette travelled through Lowndes County along U.S. Highway 80 approaching Montgomery, it was struck from behind by an Oldsmobile driven by Dan Jerome Jarrett. Although Jarrett's speed was hotly disputed at trial, it is undisputed that he was exceeding the fifty-five mile per hour speed limit by at least twenty miles per hour, and that he had been drinking.[1]
*1180 Upon impact, the Chevette burst into flames and spun to the right shoulder of the road. Mr. Edwards, after finding the front driver's-side door jammed, managed to kick open the front passenger-side door, crawl over his wife, through that door, and pull her from the flames after him. He then attempted to rescue his sons from the rear of the car, but was unable to do so because of the intense heat. Both children perished in the flames.
The Edwardses brought suit against General Motors (G.M.), the manufacturer of the Chevette, and Jarrett, asserting, inter alia, that Jarrett was negligent in the operation of his vehicle, and that G.M. sold the Chevette in a defective and unreasonably dangerous condition, within the meaning of the Alabama Extended Manufacturer's Liability Doctrine (A.E.M.L.D.), as first set forth in Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala.1976), and Atkins v. American Motors Corp., 335 So.2d 134 (Ala.1976). In particular, they alleged that the design of the gas tank, which was placed in the "crush zone" (between the rear bumper and axle of the Chevette), the fuel filler neck, which was rigidly connected to the left rear quarter panel, and the doors, were defective.
After a lengthy trial the jury returned a verdict finding both Jarrett and G.M. liable for the Edwardses' personal injuries, but finding only G.M. liable for the wrongful deaths of Kelvin and Reginald. The trial court, after hearing argument from both sides, instructed the jury that its verdicts were inconsistent and ordered it to resume deliberation. Shortly thereafter, the jury submitted the following written question to the trial judge: "Do you mean being consistent on damages rendered or defendants charged?" After that, the following colloquy occurred between the judge and the jury:
"Ladies and gentlemen, what I'm about to say to you will be taken along with you and by you with all of the Court's charge heretofore given to you as the law of this case, and also the charge that the Court gave you a few moments ago, which among [other] things stated to you that anything that the Court says is not to influence your decision or not to indicate to you or suggest to you anything by the Court as to what you would do. That is totally within the discretion of the jury.
"Now, taking all of that into consideration and to be more specific in an attempt to answer your question, as a part of the Court's instructions to you a few moments ago the Court said this, that the Court charges the jury that the jury cannot find against both Defendants in Mr. Edwards' case and Mrs. Edwards' case for their individual claim for injuries, and further finding against the Defendant General Motors only in the cases involving the death of the children.
"Now, I am also hesitant to do this, because sometimes I get some things that I can't answer. As I have told you, the function of the Court is only to pass upon the law and upon the admissibility of the evidence. You are the finders of the facts. I'm limited as to what I can say and do because that's up to you. But does that seem to answer your question, Mr. Foreperson?
"MR. NORTON: Yes, sir."
Thereafter, the jury returned to its deliberations and subsequently returned a second verdict completely exonerating Jarrett but holding G.M. liable for $2,000,000 in each of the wrongful death claims, $50,000 for Mrs. Edwards's injuries and $25,000 for Mr. Edwards's injuries.
Pursuant to G.M.'s motion, the trial court remitted each wrongful death award by $600,000 to $1,400,000, making the total verdict against G.M. $2,875,000. G.M. appealed and the Edwardses cross-appealed from the remittitur.
On appeal, G.M. contends, inter alia: (1) that the verdict against it was against the great weight of the evidence because the Edwardses failed to prove that the Chevette was defective or that the defect proximately caused the injuries complained of; (2) that the instructions given the jury, particularly in regard to proximate cause *1181 and "crashworthiness," were "misleading, incomplete and erroneous"; and (3) that the jury's verdict exonerating Jarrett while holding G.M. solely liable is inconsistent.

I
The "crashworthiness doctrine," which is also referred to as the "second collision doctrine" or the "enhanced injury doctrine," is a recent development in the area of products liability law, so recent, in fact, that prior to 1968 a case of this nature would likely have been subject to dismissal for failure to state a claim upon which relief could be granted. While all jurisdictions which have adopted one of the various forms of liability applicable to manufacturers, such as our Alabama Extended Manufacturer's Liability Doctrine (A.E.M. L.D.), have always recognized that a cause of action exists where a defect in an automobile causes an accident which injures the ultimate consumer or one within the foreseeable scope of the automobile's use, until the landmark decision of Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968), many jurisdictions, following the reasoning expressed in Evans v. General Motors Corp., 359 F.2d 822 (7th Cir.1968), cert. denied, 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966), overruled, Huff v. White Motor Corp., 609 F.2d 286 (7th Cir.1979), held that, where there was no allegation that the defect in the automobile caused the accident to happen, no cause of action arose against the vehicle's manufacturer. Ropiequet, Current Issues Under the "Second Collision" Doctrine, For the Defense, Oct. 1983, at 12-17.
The decisions in Evans and its progeny were based upon the reasoning that, although an automobile manufacturer has a duty to design vehicles which are reasonably safe for their intended use, the intended use of an automobile does not include participation in collisions, regardless of the fact that such collisions are foreseeable. Id.; Evans, supra, at 825. Therefore, Evans held, no manufacturer has a duty to design an accident-proof vehicle nor a vehicle that is safer from the obvious danger of collision than any other vehicle.
Although a few jurisdictions have continued to follow Evans and others have used the reasoning expressed therein to limit the scope of the "crashworthiness doctrine," Foland, Enhanced Injury: Problems of Proof in "Second Collision" and "Crashworthy" Cases, 16 Washburn L.J. 601 (1977), the majority of jurisdictions have adopted the Larsen view, i.e., that an automobile manufacturer may be held liable where its design enhances the injuries sustained in a collision. Larsen, supra, at 503; Ropiequet, supra, at 14; Note, Apportionment of Damages in the "Second Collision" Case, 63 Va.L.Rev. 475 (1977).
In Larsen, the plaintiff was severely injured when the 1963 Chevrolet Corvair he was driving was involved in a head-on collision that caused the car's steering mechanism to be thrust into his head. G.M., the manufacturer, successfully moved for summary judgment in federal district court, and the plaintiff appealed to the Eighth Circuit Court of Appeals, which reversed, holding that, while a manufacturer is under no duty to design an accident-proof vehicle, the manufacturer of a vehicle does have a duty to design its product so as to avoid subjecting its user to an unreasonable risk of injury in the event of a collision. Larsen, supra, at 502. The court's reasoning was that collisions are a statistically foreseeable and inevitable risk within the intended use of an automobile, which is to travel on the streets, highways, and other thoroughfares, and that, while the user must accept the normal risk of driving, he should not be subjected to an unreasonable risk of injury due to a defective design. Larsen, supra, at 502-05.
Neither Evans nor Larsen has ever been cited in Alabama and no Alabama court has dealt, per se, with the issue of "crashworthiness." Although Evans and Larsen are not binding upon this Court, they may, of course, be considered as persuasive authority. Having studied both opinions and the cases following them, we find that the rule stated in Larsen is more in keeping with *1182 the purpose of the A.E.M.L.D., which is to protect consumers against injuries caused by defective products. In fact, as the Edwardses point out, as far back as Atkins, supra, this Court recognized, by implication, that a cause of action exists against an automobile manufacturer when a defect in its product causes it to fail during a collision, producing injury.[2] What we did by implication in Atkins, we now do explicitly by joining the majority of jurisdictions in following Larsen.
We must now consider how a "crashworthiness" cause of action may arise against a manufacturer. Generally, in cases where a defect in a vehicle is alleged to have caused an injury-producing accident, manufacturers have been sued on one or more of three legal theories: implied warranty, under Alabama's implied warranty of merchantability statute, Code 1975, § 7-2-314; common law negligence; and liability under the A.E.M.L.D. C. Gamble & D. Corley, Alabama Law of Damages, § 30-10 (1982). Presumably, all three theories would also apply in cases like the present one, where the defect is not alleged to have caused the collision but only to have caused the injuries suffered therein. However, since breach of warranty was never raised, and since the Edwardses' negligence claim against G.M. was dropped, we will not address the applicability of those two theories. Instead, we will limit our discussion to the theory considered by the jury, the A.E.M.L.D.
As previously stated, the A.E.M.L.D. was first announced in Casrell, supra, and Atkins, supra, and, since that time, it has been applied against manufacturers of machinery, Andrews v. John E. Smith's Sons Co., 369 So.2d 781 (Ala.1979); airplanes, First National Bank of Mobile v. Cessna Aircraft Co., 365 So.2d 966 (Ala.1978); and automobiles, Jett v. Honda Motor Co., Ltd., 339 So.2d 66 (Ala.1976), and Joe Sartain Ford, Inc. v. American Indemnity Co., 399 So.2d 281 (Ala.1981). We see no reason why the A.E.M.L.D. should not be applied, so long as all the elements thereof are present.
The elements of an A.E.M.L.D. cause of action are as follows:
"To establish liability, a plaintiff must show:
"(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
"(a) the seller is engaged in the business of selling such a product, and
"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
"(2) Showing these elements, the plaintiff has proved a prima facie case although
"(a) the seller has exercised all possible care in the preparation and sale of his product, and
"(b) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller." (Footnote omitted.) Casrell, supra, at 132-33; Atkins, supra, at 141."
The term "injury or damages" has been held to include death. Caterpillar Tractor Co. v. Ford, 406 So.2d 854 (Ala.1981).
Once these elements are proved, a manufacturer may offer, in addition to the affirmative defenses recognized under the A.E.M.L.D. (lack of causal relation, which is applicable only to vendors, not manufacturers, Casrell, supra at 134; assumption of risk; and contributory negligence), evidence disproving any one or several of the elements of plaintiff's prima facie case. Atkins, supra, at 143. Among these elements are the requirements that the product was "in a defective condition unreasonably dangerous to the plaintiff," and that the defect proximately caused the injuries suffered."
*1183 In the case at bar, it was stipulated that neither contributory negligence nor assumption of the risk was present on the Edwardses' part. It is also undisputed that G.M. is a seller engaged in the business of selling Chevettes, and that the Chevette in question reached the Edwardses in an unchanged condition. Furthermore, because G.M. is a manufacturer, not just a vendor, the "causal relation" defense is not applicable here. Consequently, the only two defenses available to G.M. at trial were: lack of a defect in the Chevette, or, if a defect existed, lack of proximate cause between the defect and the injuries. Because both defectiveness and proximate cause were elements of the Edwardses' prima facie case, the burden rested upon them to prove, not upon G.M. to disprove, these elements. Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc., 395 So.2d 991, 995 (Ala.1981).
In order to meet their burden of proving defectiveness, it was necessary that the Edwardses show more than that the Chevette's fuel system and doors failed during the collision. Failure of a product does not presuppose the existence of a defect. Id. at 995-96. As this Court stated in Casrell:
"`Defective' is interpreted to mean that the product does not meet the reasonable expectations of an ordinary consumer as to its safety," and "[A] `defect' is that which renders a product `unreasonably dangerous,' i.e., not fit for its intended purpose...." 335 So.2d at 133.
In considering whether a directed verdict should have been granted in favor of a defendant/manufacturer, this Court, in Haven Hills Farm, Inc., supra, at 994, expounded on an earlier statement in Casrell and concluded:
"[P]roof of the specific defect, i.e., the exact act, omission, process, construction, etc., resulting in the product's failing its intended use, is not required. `If a product is unreasonably dangerous, it is necessarily defective, and the consumer should not be required to prove defectiveness as a separate matter."
Therefore, in order to present his case to the jury, a plaintiff need not prove, with specificity, the defect rendering the product unreasonably dangerous. He must, however, in order to avoid a directed verdict, offer some evidence, at the very least a scintilla, showing that a defect existed and that the defect proximately caused his injury. Rule 50(e), Ala.R.Civ.P.; Segler v. Ford Motor Co., 438 So.2d 297 (Ala.1983).
Once a scintilla of evidence is produced showing defectiveness and proximate cause, it is for the jury to decide whether a defect in fact existed and whether that defect proximately caused plaintiff's injuries. This raises the important question of what the jury should be instructed that a plaintiff in this type of case must prove in order to persuade them that the manufacturer's automobile was defective and that the defect caused his injury. It is over this issue that G.M. disagrees with the trial court, and it is over this issue that many of the jurisdictions following Larsen also disagree. Ropiequet, supra, at 12. This disagreement between the various jurisdictions results from the fact that some have chosen to follow the reasoning expressed in Huddell v. Levin, 537 F.2d 726 (3d Cir. 1976), while others have adopted the reasoning of Fox v. Ford Motor Co., 575 F.2d 774 (10th Cir.1978). (For cases following each, see Ropiequet, supra, at 21, nn. 17-21; Annot., 9 A.L.R. 4th 494 (1981)).
In Huddell, the driver of a 1970 Chevrolet Nova, Dr. Huddell, died of extensive brain injuries suffered when his car was rear-ended by another vehicle, causing his head to strike the Nova's head restraint, which consisted of a "relatively sharp, unyielding metal edge, covered by two inches of soft, foam-like material." His widow brought suit against G.M., and others, alleging that the head restraint was defectively designed. As in the present case, the jury returned a verdict against G.M., the manufacturer, and exonerated the striking driver. The jury also exonerated the striking driver's employer, whose truck he was driving at the time of the accident. The United States District Court entered against the striking driver and his employer *1184 a judgment notwithstanding the verdict, and all three defendants appealed. On appeal, G.M. argued, inter alia, that the circumstances of the accident, particularly the violence of the high speed collision, precluded any reasonable conclusion that the head restraint was defective. G.M. contended that the severity of the accident was a critical factor in determining the defectiveness of the design.
The appeals court reversed and remanded, holding, in regard to G.M., that there had been "serious and fundamental deficienc[ies] in plaintiff's proof, and ... several errors in the jury instructions." Huddell, supra, at 741. The appeals court echoed the language of Larsen, by stating:
"[T]he manufacturer is required to take reasonable stepswithin the limitations of cost, technology, and marketability to design and produce a vehicle that will minimize the unavoidable danger. Rephrased in the terminology of strict liability, the manufacturer must consider accidents as among the `intended' uses of its product." 537 F.2d at 735.
After concluding that the plaintiff, Dr. Huddell's widow, had presented sufficient evidence to raise jury questions on the issues of defectiveness and proximate cause, the court discussed, at length, the deficiencies it saw in her proof and in the court's instructions.
The court stated:
"Unlike orthodox products liability or negligence litigation, crashworthy or second collision cases impugning the design of an automobile require a highly refined and almost invariably difficult presentation of proof in three aspects. First, in establishing that the design in question was defective, the plaintiff must offer proof of an alternative, safe design, practicable under the circumstances. This the plaintiff did: plaintiff's expert Albert Fonda introduced into evidence the head restraints of several other automobile manufacturers which allegedly were better designed; and it was suggested that G.M.'s head restraint would have been safer if it had merely been turned around so that the `ax-like' portion was not `aimed' at the rear of the driver's head. Second, the plaintiff must offer proof of what injuries, if any, would have resulted had the alternative, safer design been used. This, in our view, was not satisfactorily established. We agree in this regard with Judge Barlow in Yetter v. Rajeski, 364 F.Supp. 105, 109 (D.N.J. 1973) that `it is absolutely necessary that the jury be presented with some evidence as to the extent of injuries, if any, which would have been suffered ... had the plaintiff's hypothetical design been installed....' Third, as a corollary to the second aspect of proof, the plaintiff must offer some method of establishing the extent of enhanced injuries attributable to the defective design. Having failed to establish satisfactorily the second aspect, a plaintiff necessarily must fail with regard to the third.
"Albert Fonda testified that the accident would have been `survivable' if the head restraint had been `designed differently.' Dr. Geikas similarly testified that the accident would have been `survivable' if the head restraint had been designed `for distribution of load, attenuation of force.' The district court summarized the testimony: `Plaintiff's experts testified unequivocally that if the head restraint had been designed to take these principles into account, Dr. Huddell would have survived the accident.' 395 F.Supp. [64] at 75. But the record does not indicate the specific meaning of the term `survivable,' and there is no testimony as to the extent of injuries, if any, which would have resulted in a survivable crash. Although Dr. Geikas testified that there was no evidence of significant injury to vital organs from the accident as it happened, this ignored the possibility that injury to those organs might have been more severe if the great forces of the collision had been more widely distributed over the head and body by an alternate head restraint design. It was not established whether the hypothetical victim of the survivable crash would have sustained no injuries, temporary injuries, *1185 permanent but insignificant injuries, extensive and permanent injuries, or, possibly, paraplegia or quadriplegia.
We recognize the serious problems of predicting the direction of state law in troublesome cases like this and, particularly, we understand the difficulties facing a federal trial court forced to make such a prediction. Upon reflection, however, we are constrained to disagree with the district court's prediction in this case that state law would require G.M. to carry the burden of establishing what damage was attributable to the accident itself as opposed to the allegedly defective head restraint. 395 F.Supp. at 77. The crashworthy or second collision theory of liability is a relatively new theory, its contours are not wholly mapped, but one thing, at least, is clear; the automobile manufacturer is liable only for the enhanced injuries attributable to the defective product. This being the essence of the liability, we cannot agree that the burden of proof on that issue can properly be placed on the defendant manufacturer.
"Without proof to establish what injuries would have resulted from a nondefective head restraint, the plaintiff could not and did not establish what injuries resulted from the alleged defect in the head restraint. Without such proof, the jury could not have properly assessed responsibility against G.M. for the death of Dr. Huddell.
"It is well, indeed necessary, to emphasize the fundamental point of departure between our approach and that proffered by the concurrence. We do not perceive the analysis of `second collision' or `enhanced injury' cases to track the legal lore surrounding concurrent tortfeasor actions which, in the concurrence's formulation, `have combined contemporaneously to cause the injuries.' Concurring opinion, post, at 744. (Emphasis added.) `Second collision' cases do not implicate `clearly established double fault' for the same occurrence. Clearly, if the theoretical underpinnings for liability in this case are to be given effect, Levin may be held liable for all injuries, but General Motors may only be held liable for `enhanced injuries.' Analogies to concurrent actions combining to cause a single impact are simply not applicable. Similarly, analogies to chain collisions are not applicable where, as here, one party is sued on a fault theory for the collision and the other party is sued on the theory of strict liability for the `second collision.' A second source of disagreement between us and Judge Rosen is the latter's assumption that `[a] failure in apportionment must then needs excuse both wrongdoers.' Ibid at 744. The burden of apportionment applies only to plaintiff's claim against General Motors. Should plaintiff fail to meet her burden on this claim, the brute fact is that the negligent driver would not escape liability on the same ground. Traditional negligence concepts determine the case against Levin and the extent of his liability." 537 F.2d at 737-39.
The court then noted:
"The district court instructed the jury that `if there was any substantial possibility that Dr. Huddell would have survived the collision [had] the head rest not been defective, assuming you find such a defect, General Motors would be liable if such defect was a substantial contributing factor or a proximate cause of Dr. Huddell's death.' ... This instruction, although it properly emphasizes the finding of a defect, misstates the plaintiff's burden of proof. A plaintiff must prove his case by a preponderance of the evidence; proof of a `substantial possibility' of survival does not comport with that affirmative burden. Moreover, this instruction violated the basic jural conception upon which a crashworthy case is based, viz., that the automobile manufacturer is liable only for the enhanced injuries occasioned by the defectiveness of its product.
"Over objection, the court instructed the jury:
I charge you, however, that the relative severity of the impact is relevant *1186 only to your consideration of proximate cause, not to your consideration of whether there was a defect in the design of the head rest....
"This instruction, we believe, was error. If a products liability case is submitted to the jury, it is the jury who must determine whether the product was `reasonably fit for the ordinary purposes for which such articles are sold and used.' Santor v. A and M Karagheusian, Inc., [44 N.J. 52, at 67, 207 A.2d 305, at 313 (1965)]. The `relative severity of the impact' goes to the heart of the issue of defectiveness in terms of the `ordinary purposes' for which the product, the head restraint, was designed.
"We emphasize here the unique aspect of `defectiveness' presented by a crashworthy case. Ordinarily, where a product malfunctions and itself precipitates injury, there is little problem in establishing a defect; the issue frequently is whether the defect is traceable to the defendant manufacturer, or whether the defect arose after the product left the manufacturer's control, e.g., by long usage of the product. See Moraca v. Ford Motor Co., 66 N.J. 454, 332 A.2d 599 (1975). However, in a crashworthy case, impugning the design of the product in question, the difficulties are reversed. There can be no doubt that the design of the product is traceable to the manufacturer. The central issue is: was the product `defective'? And this can only be evaluated in the context of a particular risk. A manufacturer is required to design a product `reasonably' fit for the `ordinary' purposes for which it is sold and used." 537 F.2d at 740.
Thus, in Huddell, the court placed a difficult burden on plaintiffs in "crashworthiness" cases, requiring them to prove defectiveness by showing the existence of a better alternative design and, with particularity, the difference between the injuries actually sustained and those which would have been sustained had the alternative design been employed.
In contrast, the burden placed upon plaintiffs by Fox, supra, is much less severe. In Fox, two women, Mary Elaine Fox and Diane W. Smith, died from injuries suffered in a front-end collision between a Ford Thunderbird, in which they were riding as passengers in the back seat, and a pickup truck. Their husbands, who were riding in the front seat of the Thunderbird, and who escaped with relatively minor injuries, brought suit, alleging that the seatbelts their wives were wearing were defective.
The Fox court, following Larsen, supra, agreed with the Huddell court that a plaintiff in a "crashworthiness" case must prove a defect in the automobile's design; but, it refused to accept the Huddell court's view that a defect can only be proven by showing a better alternative design, choosing instead to adopt a much more nebulous test whereby defectiveness is determined by weighing the utility of a design (including cost considerations) against the foreseeability of a collision and the possibility of injuries likely to result therefrom. The court stated:
"In order to determine the reasonableness of the manufacturer's design, it is necessary to weigh, on the one hand, the likelihood of injury should a collision occur, together with the gravity of the injury, if it does occur, against, on the other hand, the costs of the precautions which the manufacturer would have to take in order to avoid the hazard of such injury. See Dreisonstok v. Volkswagenwerk, A.G., 489 F.2d 1066 (4th Cir.1974); Volkswagen of America, Inc. v. Young, 272 Md. 201, 321 A.2d 737, 746-47 (1974); Noel, Manufacturer's Negligence of Design or Direction for Use of a Product, 71 Yale L.J. 816, 818 (1962). A factor to be weighed is whether the vehicle has been designed to serve a special purpose, which purpose would be undermined if the design were altered. See Dreisonstok, supra, at 1071-75; Dyson v. General Motors Corp., 298 F.Supp. 1064, 1073-74 (E.D.Pa.1969). In Dreisonstok, it was held to be reasonable for the manufacturer to place the driver's seat closer *1187 than usual to the front of the vehicle in order to achieve more cargo or passenger space, which was a unique feature of this particular vehicle and which served to attract purchasers.
"We note, as did the trial court in its charge, that manufacturers need not make a vehicle which is safe for all collisions. Obviously, there is great difficulty in designing and building a vehicle capable of resisting injury in the severe collision. See Huddell v. Levin, 537 F.2d 726, 735 (3d Cir.1976); Dreisonstok, supra, at 1075. Another important consideration is, as noted, the cost factor. The manufacturer can reasonably be required to make minor and inexpensive changes. The question becomes harder when he is called on to make extensive and costly redesigns of the entire automobile. W. Prosser, Law of Torts 646 (4th ed. 1971)." 575 F.2d at 783.
The Fox court also rejected the Huddell court's holding that "crashworthiness" plaintiffs must prove, with particularity, what injuries would have occurred had an alternative design been used, in favor of a rule requiring only that, after proving a defect, the plaintiff prove that the defect was the proximate cause of his injuries. The court stated:
"It is Ford's position that the doctrine of `crashworthiness' renders it liable, if it is to be held liable, only for those defects which enhance the injuries which would have been suffered as a result of the original collision. More important, it contends that the burden is on the plaintiffs to prove in some detail the damages flowing from Ford's violations. Undoubtedly, the position taken is correct to the extent that it limits the manufacturer's liability to the injuries which are the proximate result of the defects. This rule was expounded in Larsen v. General Motors Corp., 391 F.2d 495, 503 (8th Cir.1968), which said:
"`the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result, of the impact or collision absent the defective design.'
"See also Knippen v. Ford Motor Co., 178 U.S.App.D.C. 227, 546 F.2d 993 (1976); Polk v. Ford Motor Co., 529 F.2d 259 (8th Cir.), cert. denied, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976) (manufacturer not a joint tort-feasor with other driver); Turcotte v. Ford Motor Co., 494 F.2d 173 (1st Cir.1974); Dyson v. General Motors Corp., 298 F.Supp. 1064 (E.D.Pa.1969).
"Generally this duty to prove so-called enhanced damages is simply a part of the plaintiff's responsibility to prove proximate cause, that is, that the defendant in such a case is liable only for those damages which are within the orbit of risk created by him, but Ford would have us say that the plaintiffs were required to prove with specificity the injuries which flowed specifically from its deficiencies.
"The case which is relied on by Ford to illustrate its position is Huddell v. Levin, 537 F.2d 726 (3d Cir.1976). There the holding was that plaintiff in a collision case such as the present one had the burden of proving enhanced injuries and that the presentation of evidence that the accident was survivable did not meet this burden. The thesis of this case was that collision cases are to be treated differently from other liability or negligence cases as far as the specificity of proof is concerned. It refused to follow the orthodox doctrines of joint liability of concurrent tort-feasors for injuries which flow from their concurring in one impact.
"We fail to see any difference between this type of case and the other case in which two parties, one passive, the other active, cooperate in the production of an injury. Each one's contribution in a causal sense must be established. Damages may be apportioned between the two causes if there are distinct harms or a reasonable basis for determining the causes of injury. Restatement of Torts, Second, § 433A.
"But death is a different matter. It is not a divisible injury in which apportionment *1188 is either appropriate or possible. See Restatement, supra, § 433A, comment i; Prosser, Law of Torts 315 (4th ed. 1971). The Huddell court addressed this question by holding that plaintiff could not assert that death was divisible by saying that decedent would not have died but for the defects, and `then assert that it is indivisible in order to deny to General Motors the opportunity of limiting damages.' This position, however, fails to recognize that wrongful death is different from [a] cause of action for injuries, which has different elements and a different measure of damages such as pain and suffering.
"In this case the court instructed the jury that defendant Ford Motor Company was not liable to either of the plaintiffs unless it breached a duty owing to the decedents Mary Elaine Fox and Diane W. Smith, and the breach of that duty was the proximate cause of their deaths. The court also instructed that the proximate cause of an injury is that cause which is natural and continuous, unbroken by an efficient intervening cause, which produces the injury and without which the injury would not have occurred. At another place the court instructed: `In order for you to find that the Defendant breached this duty, you must find that the unreasonable risk of injury was brought about by the defect or defects in the design of a vehicle, and you must further find that such defect or defects, if any, were the proximate cause of the deaths of Mary E. Fox and Diane W. Smith." 575 F.2d at 786-88.
G.M. would have us adopt the Huddell rule and advances an argument identical to the one it advanced in that case, that it is not liable because the accident in question was so severe that any design, no matter how reasonable, would have produced the same injuries. In the alternative, G.M. argues that, even if its design was defective and that defect contributed to plaintiffs' injuries, it is liable only for those injuries directly attributable to the defect. The Edwardses, on the other hand, ask us to adopt a rule of law more akin to the view expressed in Fox, and contend that, having met the burdens of proving defectiveness and proximate cause, as Fox requires, they are entitled to the verdict they received. After reviewing Huddell, Fox, the cases following them, and various articles on the subject of "crashworthiness," we find that, while both the Huddell and Fox lines of cases have their merits, both also have serious shortcomings.
The problem we see in Fox is that the standard it sets for determining defectiveness is, as stated above, quite nebulous. That test involves simply weighing the benefits versus the risks of a particular design. Fox, supra, at 783. It has generally been held, and we agree, that such a weighing process is necessary in "crashworthiness" cases and that the factors to be considered include:
"(1) The usefulness and desirability of the productits utility to the user and to the public as a whole.
"(2) The safety aspects of the productthe likelihood that it will cause injury, and the probable seriousness of the injury.
"(3) The availability of a substitute product which would meet the same need and not be as unsafe.
"(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
"(5) The user's ability to avoid danger by the exercise of care in the use of the product.
"(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
"(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product."
Dawson v. Chrysler Corp., 630 F.2d 950, 957 (3d Cir.1980), cert. denied, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). *1189 Other factors that may be considered include:
"The intended use of the vehicle, styling, cost to change design, the obviousness of the defect, and the circumstances of the accident itself...."
Stonehocker v. General Motors Corp., 587 F.2d 151, 154 (4th Cir.1978), citing, Dreisonstok v. Volkswagenwerk, A.G., 489 F.2d 1066 (4th Cir.1974). See generally, Hoenig, Resolution of "Crashworthiness" Design Claims, 55 St.J.L.Rev. 633-727, at 659-664; see also, Fox, supra, at 783. However, we also believe, as the Huddell court recognized, but as the Fox court did not, that proof of defectiveness also requires proof that a "safer" practical, alternative design was available to the manufacturer.
As is frequently stated in regard to defectiveness:
"Manufacturers are not required to produce automobiles with the `strength and crash-damage resistance features of an M-2 Army tank.' Melia v. Ford Motor Co., 534 F.2d 795 (8th Cir.1976) (Bright, J., dissenting). The critical question is whether, under all of the surrounding circumstances, a manufacturer has created an unreasonable risk of increasing the harm in the event of the statistically inevitable collision."
Curtis v. General Motors Corp., 649 F.2d 808, 812 (10th Cir.1981). To hold that no safer design need be proved would be to make manufacturers of automobiles insurers of their products' safety, by holding them liable for selling allegedly defective vehicles, even though those vehicles could not have been made safe through the use of any other design. This is neither the intent of Larsen nor the intent of the A.E. M.L.D.
While we agree that the existence of a safer, practical, alternative design must be shown, it is over the particularity with which the existence of such a design must be proven that we take issue with Huddell. Specifically, although we agree with Huddell that a design cannot be seen as "safer" unless it would have prevented or at least have limited the injuries complained of, had it been used, we hold that under Alabama law a "crashworthiness" plaintiff is not required to prove precisely which of his injuries were caused by the striking driver and which were caused by the defective design of the defendant manufacturer's automobile, as Huddell required. There can be no doubt that, as the Fox court concluded, these requirements expressed in Huddell were intended to give the trier of fact some basis for apportioning damages between the striking driver and the manufacturer. As Fox pointed out, however, in the majority of jurisdictions, where two or more tortfeasors act to produce a single indivisible injury, such as death, apportionment is not allowed between the tortfeasors. Fox, supra, at 787; see also, Richardson v. Volkswagenwerk A.G., 552 F.Supp. 73 (W.D.Mo.1982).
In the final analysis, it is over this single issue, the apportionability of normally unapportionable injuries, that the Huddell line of cases and the Fox line of cases differ. Huddell holds that, because of the unique nature of crashworthiness cases, the trier of fact must always apportion damages between those attributable to the manufacturer's defective design and those attributable to the striking driver. Note, Apportionment of Damages in the Second Collision case, 63 Va.L.Rev. 475, 491 (1977). On the other hand, Fox, following the dictates of the Restatement (Second) of Torts §§ 433, 433A, and 433B (1965), holds that if plaintiff's injuries are indivisible, the manufacturer and striking driver are jointly and severally liable as concurrent tortfeasors. Richardson, supra, at 80; Fox, supra, at 787; see also, Ropiequet, supra, at 14. The Huddell court based its decision on feelings that concurrent tortfeasor principles are inapplicable in "crashworthiness" cases. Huddell, supra, at 738. This distinction between "crashworthiness" defendants and other concurrent tortfeasors is apparently based on the Huddell court's policy decision that manufacturers who build defective automobiles are somehow less culpable than others. This is a distinction *1190 which, given the intent of the A.E.M. L.D., to protect consumers from unreasonably dangerous products, this Court is not prepared to make. As the court stated in Mitchell v. Volkswagenwerk, A.G., 669 F.2d 1199, 1206 (8th Cir.1982), the Huddell court viewed Larsen as requiring "fresh legal thinking," leading it to conclude that concurrent negligence principles do not control. But, as the Mitchell court concluded, such reasoning "is difficult to follow."
Because Huddell requires apportionment of damages in all "crashworthiness" cases, it cannot be followed in this regard in Alabama. Like the law of the state of Wyoming, under which Fox was decided, Alabama law holds that, where two or more tortfeasors act to produce an indivisible injury, apportionment is not allowed. Ex parte City of Huntsville v. Davis, 456 So.2d 72 (Ala.1984). As Fox points out, death is certainly an indivisible injury. The same can be said for the Edwardses' burn injuries. Thus, in Alabama, where an accident results in an indivisible injury, such as death, an automobile manufacturer cannot attempt to limit its liability by proving, or requiring the plaintiff to prove, what portion of plaintiff's injuries is attributable to the defectiveness of the vehicle it manufactured and what portion is attributable to the striking driver.[3] Consequently, the only proof of damages that will limit the manufacturer's liability in crashworthiness cases is proof that, regardless of the design used, the identical injuries were inevitable. In such a case, the manufacturer's liability is not only limited, it is completely eliminated, because plaintiff has failed to prove "cause in fact," a fundamental element necessary to prove proximate cause between the defective condition and his injuries. W. Keeton, D. Dobbs, R. Keeton, D. Owen, Prosser & Keeton on Torts, §§ 41, p. 265 (5th ed. 1984). If, on the other hand, the proof shows that an alternative design would have eliminated plaintiff's injuries totally or would have reduced them, proximate cause between the defect and the injury is proven, and the manufacturer is jointly and severally liable along with the striking driver (assuming that he is found liable) for the entire amount of the injuries suffered. Thus, the manufacturer faces an all or nothing proposition; either he is liable for all the damages or he is liable for none, depending upon whether an alternative design would have prevented or reduced plaintiff's injuries.
Like the Fox court, this Court sees no reason to dismantle our longstanding rules of concurrent tortfeasor liability merely because "crashworthiness" claims do not present, as the Huddell court called it, "an orthodox strict liability case." Therefore, while it was necessary for the Edwardses to produce a preponderance of evidence indicating that the injuries suffered would have been eliminated or reduced had an alternative design been employed, we do not hold that it was necessary for them to show precisely either the injuries which would have occurred had a "safer," practical, alternative design been used or the extent of their injuries attributable to the alleged defects in the Chevette.
The Fox court, we believe, was correct in holding that the automobile manufacturer's liability is ultimately a question of proximate cause which must be determined by the trier of fact after the plaintiff has presented evidence of a defect in the automobile and a causal connection between *1191 that defect and the injuries he suffered. A plaintiff, therefore, has the burden in a "crashworthiness" case to prove no more than the A.E.M.L.D. requires, namely, the existence of a defect and proximate cause.
Of all the cases we have read on this subject, we believe that Lachocki v. Contee Sand & Gravel Co., 41 Md.App. 579, 398 A.2d 490 (1979), best expresses our position. In that case, the court concluded:
"[The principle of `crashworthiness,'] though somewhat obscured by the developing professional patois, is but a part of the necessary proofs of any traditional negligence or strict liability case, i.e., that there be some reasonable connection between the act or omission of the defendant and the damage or injury that the plaintiff has suffered. W. Prosser, The Law of Torts 236 (4th ed. 1971). In older judicial jargon that connection is referred to as `proximate cause' and is intended to depict the limitation placed upon the wrongdoer's responsibility for the consequences of his conduct. Because in strict liability `second injury cases' the initial injury is dependent upon some preceding primary negligence, the injury that was proximately caused by the design or construction defect is most often distinguished from that which would have occurred despite the defect, as the `enhanced' injury. We agree with G.M. that there must be evidence of such causal connection. We depart from G.M. on how much is enough." (Footnote omitted.)
41 Md.App. at 590, 398 A.2d at 498.
To summarize, this Court follows Larsen in recognizing that a cause of action does exist against an automobile manufacturer where it is alleged that an automobile manufactured by it was defective, and was involved in an accident, and that the defect, although not causing the accident to occur, contributed to the injuries sustained therein. This Court also holds that such an action may be brought under the A.E.M. L.D.
In order to recover against the automobile manufacturer in such cases, a plaintiff must prove the following:
I. That the plaintiff (or one upon whose behalf he brings suit) was involved in an automobile accident.
II. That an automobile involved in that accident was manufactured by the defendant manufacturer.
III. That, at the time of the accident, that automobile was substantially unchanged since leaving the manufacturer.
IV. That the automobile was defective. That is to say, that it did not meet the reasonable expectations of an ordinary consumer as to its safety because it was unreasonably dangerous, i.e., not fit for its intended purpose, which is to travel the streets, highways, and other thoroughfares. In order to prove defectiveness, the plaintiff must prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the automobile. The existence of a safer, practical, alternative design must be proved by showing that:
(a) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design, and that;
(b) taking into consideration such factors as the intended use of the vehicle, its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used.
V. That the defect in the automobile proximately caused his injuries.
Plaintiff must offer at least a scintilla of evidence tending to prove each of the elements in order to present a prima facie case; if he does, the defendant manufacturer may offer, in addition to evidence to *1192 counter plaintiff's prima facie case, the two affirmative defenses recognized as available to manufacturers under the A.E.M.L. D.(1) assumption of risk, and (2) contributory negligenceand, of course, the defense that the proximate cause of the injury or death was the wrongful conduct of the striking driver or other intervening agency.
Once plaintiff presents his prima facie case, thereby avoiding a directed verdict in favor of the defendant, and the defendant presents its available defenses, the case is placed squarely within the province of the jury, whose verdict will not be disturbed on appeal unless so clearly divergent from the evidence and law as to be palpably wrong and manifestly unjust. Files v. Schaible, 445 So.2d 257 (Ala.1984); Tallant v. Grain Mart, Inc., 432 So.2d 1251 (Ala.1983).
Applying the foregoing to the case at bar, and after reviewing the evidence presented in this case, we find that at least a scintilla of evidence tending to prove each element was presented by the plaintiffs; therefore, a directed verdict would have been inappropriate. We also find that there was sufficient evidence, albeit disputed, to support the jury's verdict against G.M. Therefore, we reject G.M.'s argument that the verdict against it was against the great weight of the evidence.
In this case, G.M.'s basic defense was that the collision between Jarrett's Oldsmobile and the Edwardses' Chevette was so severe that, regardless of the design of the Chevette's fuel system and doors, the injuries which occurred were inevitable, in other words, that no "safer," practical, alternative, design would have prevented the injuries. In effect, this is nothing more than an argument that Jarrett's act of striking the Chevette was the sole unforeseeable "cause in fact" of the injuries and, therefore, was an intervening cause which relieved G.M., as a matter of law, of the liability it might otherwise have incurred for selling an allegedly defective automobile. Although there could be factual situations in which a manufacturer could be exonerated, as a matter of law, we hold that in this case a jury question was presented as to whether Jarrett's conduct was the proximate cause of the injuries and deaths. A jury cannot be expected to decide the questions of proximate cause and sole intervening cause without adequate instruction.
The trial court in this case gave the following jury instructions on proximate cause:
"Now, in order for negligence or a claim based upon negligence to be actionable, as we call it, that is, before there could be a recovery against a Defendant based upon a charge of negligence, the Plaintiff also has the burden of proving to your reasonable satisfaction that that negligence of that Defendant proximately caused or proximately contributed to cause the injuries, damages and deaths that the Plaintiffs claim were caused by the negligence.
"So, what is proximate cause? That's not approximate, a-p-p-r-o-x-i-m-a-t-e, but proximate, p-r-o-x-i-m-a-t-e. Proximate cause is the direct cause. The proximate cause of an injury or death is that cause which in the natural and probable sequence of events and without the intervention of any new or independent cause produces the injury or produces the death and without which such injury or such deaths would not have occurred.
"* * * *
"It is also a correct principle of law that if one is guilty of negligence which concurs or combines with legal liability of another, and the two combine to produce injury and/or death, each such Defendant is liable for the resulting injuries and/or deaths, and the legal liability of each will be deemed the proximate cause of the injuries and/or deaths."
G.M. objected and requested that certain more specific instructions be given in regard to proximate cause. Those requested instructions are as follows:

"REQUEST TO CHARGE NO. 20
"The proximate cause of an injury is that cause which in the natural and probable *1193 sequence of events, and without the intervention of any new or independent cause, produces the injury and without which such injury would not have occurred.

"REQUEST TO CHARGE NO. 21
"I charge you that unless you find that the acts of General Motors in a natural and probable sequence of events, and without the intervention of any new or independent cause, directly produced the injuries complained of, and without which such injuries would not have occurred, then you must find in favor of General Motors.

"REQUEST TO CHARGE NO. 21A
"I charge you that if you find that the acts of the defendant, Dan Jerome Jarrett, were independent and intervening acts, subsequent to any acts by General Motors, which proximately caused the plaintiffs' injuries, then you must render a verdict in favor of General Motors.

"REQUEST TO CHARGE NO. 26
"The Court charges you, members of the jury, that the alleged condition of a manufacturer's product must be the sole proximate cause of the injury sustained. Thus, even if you find that the Chevette was defective in some respect, you still must be reasonably satisfied from the evidence that the plaintiffs' injuries and the deaths proximately resulted from the Chevette manufactured by the defendant, General Motors. It is the plaintiffs' burden to eliminate all other independent or intervening causes of the injuries besides any alleged defect in the Chevette, and if you are not satisfied in your minds that these other causes have been so eliminated, then you must return a verdict in favor of the defendant, General Motors.

"REQUEST TO CHARGE NO. 32
"I instruct you, members of the jury, that negligence alone does not create liability. Liability is imposed only when negligence is the proximate or direct cause of death; injury or death must be a natural and probable consequence of the negligent act or omission which an ordinarily prudent person ought reasonably to foresee would result in injury. If, between the alleged act or omission and the injury, there occurs an independent, intervening or unforeseeable event, then the causal connection between the alleged negligence and the injury is broken. Therefore, if you find that the defendant, General Motors, was not negligent, or that any negligence of General Motors was not the direct or proximate cause of the injuries or deaths, then you must return a verdict against the plaintiffs and in favor of the defendant, General Motors."
The trial court denied these requests by G.M.
The instructions given by the court were, as the Edwardses point out, taken directly from Alabama Pattern Jury Instructions: Civil (A.P.J.I:Civ.) §§ 33.00, 33.01, and were correct. G.M., however, contends that in this case they were totally insufficient to instruct the jury on the issue of proximate cause, particularly as to intervening cause, so as to allow the jurors to intelligently and properly decide that critical issue. At this point, a brief review of the concept of proximate cause is in order.
It is axiomatic that regardless of a tortfeasor's culpability, regardless of whether he failed to exercise reasonable care in carrying out a duty imposed upon him by law, he may not be held liable unless there is a causal connection between his action and the injury for which the aggrieved party seeks compensation. Smith v. Alabama Water Service Co., 225 Ala. 510, 143 So. 893 (1932); International Harvester Co. v. Williams, 222 Ala. 589, 133 So. 270 (1931).
Second, the mere presence of a causal connection, that is to say, a cause and effect relationship between a particular act and an injury, is not alone sufficient to *1194 impose liability upon a tortfeasor. The act for which he is responsible must also be of such a nature that courts of law will recognize it as the "proximate cause" of the injury. Prosser & Keeton on Torts, supra, at 273. To paraphrase an earlier opinion by this Court, while proximate cause is not necessarily the cause nearest the injury, the word "proximate" adds the requirement of unbroken causation between an act and an injury produced by that act. A cause within this unbroken chain of causation is said to be "proximate," and therefore actionable, while a cause not within the chain is said to be "remote" and, thus, not actionable. Aggregate Limestone Co. v. Robison, 276 Ala. 338, 161 So.2d 820 (1964).
In Alabama, as elsewhere, foreseeability is the cornerstone of proximate cause, Alabama Power Company v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975). As a result, one is held legally responsible for all consequences which a prudent and experienced person, fully acquainted with all the circumstances, at the time of his negligent act, would have thought reasonably possible to follow that act, Prescott v. Martin, 331 So.2d 240 (Ala.1976), including the negligence of others, Williams v. Woodman, 424 So.2d 611 (Ala.1982). In short, as this Court has frequently stated, and as the trial court in this case correctly instructed the jury, a particular cause is considered the proximate cause of an injury if, in the natural and probable sequence of events, and without intervention of any new or independent cause, the injury flows from the act. City of Mobile v. Havard, 289 Ala. 532, 268 So.2d 805 (1972); Aggregate Limestone Co., supra; Mobile City Lines, Inc. v. Proctor, 272 Ala. 217, 130 So.2d 388 (1961); Morgan v. City of Tuscaloosa, 268 Ala. 493, 108 So.2d 342 (1959); Louisville & N.R. Co. v. Maddox, 236 Ala. 594, 183 So. 849 (1938). G.M. based its defense upon the principle that proximate cause only exists where no new or independent cause, also known as intervening cause, exists. On appeal, G.M. claims that the trial court's jury instructions were wholly inadequate in stating to the jury the applicable law of the case.[4]
Loosely defined, an "intervening cause" is one which occurs after an act committed by a tortfeasor and which relieves him of his liability by breaking the chain of causation between his act and the resulting injury. Vines v. Plantation Motor Lodge, 336 So.2d 1338 (Ala.1976). This Court has stated:
"However negligent a person may have been in some particular, he is liable only to those who may have been injured by reason of such negligence, as the proximate cause. Where some independent agency has intervened and been the immediate cause of the injury, the party guilty of negligence in the first instance is not responsible." Mobile City Lines, Inc. v. Proctor, 272 Ala. 217, 130 So.2d 388 (1961).
An intervening cause may be an "act of God," such as an extraordinary event of nature, Bradford v. Stanley, 355 So.2d 328 (Ala.1978), or the actions of another, usually, though not necessarily, another tortfeasor; however, a cause is not an intervening cause, so as to relieve a tortfeasor of his liability, unless it comes into active operation after the tortfeasor has acted. Prosser & Keeton on Torts, *1195 supra, at 301. In other words, it must occur between the act of the tortfeasor and the injury sustained for the chain of causation between the act and the injury to be broken. Vines, supra; Aplin v. Dean, 231 Ala. 320, 164 So. 737 (1935).
Not every cause which comes into operation after a tortfeasor has acted will relieve him of liability for his wrongful act. More than the proper temporal relationship between the tortfeasor's act and the subsequent cause is required. In order to be an intervening cause, a subsequent cause also must have been unforeseeable and must have been sufficient in and of itself to have been the sole "cause in fact" of the injury. Vines, supra, at 339. If an intervening cause could have reasonably been foreseen at the time the tortfeasor acted, it does not break the chain of causation between his act and the injury. Vines, supra; Morgan, supra; Louisville & N.R. Co. v. Courson, 234 Ala. 273, 174 So. 474 (1937). Conversely, if the intervening cause was unforeseeable, the causal chain is broken. Vines, supra. In the same respect, if the intervening cause is not sufficient to be considered the sole "cause in fact" of the injury, if it is not in and of itself sufficient to stand as the "efficient cause" of the injury, the causal chain is not broken; but, if the intervening cause was alone sufficient to produce the injury complained of, it is deemed the proximate cause of the injury and the tortfeasor or tortfeasors between whose acts and the injury the cause intervened are relieved of liability. Watt v. Combs, 244 Ala. 31, 12 So.2d 189 (1943); Goodwyn v. Gibson, 235 Ala. 19, 177 So. 140 (1937).
Where two or more tortfeasors may be responsible for the same injury, the law of proximate cause is overlapped by the law of concurrent tortfeasor liability. The basic premise of concurrent tortfeasor law is that, as alluded to above, an injury may have several concurrent proximate causes, Morgan Hill Paving Co. v. Fonville, 218 Ala. 566, 119 So. 610 (1928), including the actions of two or more tortfeasors, neither of whose action was sufficient in and of itself to produce the injury, who act, either together or independently, to produce it. Butler v. Olshan, 280 Ala. 181, 191 So.2d 7 (1966). Alabama law is clear that on such occasions, where the actions of two or more tortfeasors combine, concur, or coalesce to produce an injury, each tortfeasor's act is considered to be the proximate cause of the injury, Williams v. Woodman, 424 So.2d 611 (Ala.1982); Watt, supra, and each tortfeasor is jointly and severally liable for the entire injury. United States Fidelity & Guaranty Co. v. Jones, 356 So.2d 596 (Ala.1977); Butler, supra.
Because of joint and several liability, no concurrent tortfeasor may assert the culpability of any other tortfeasor as a defense to his own liability. Williams, supra, citing Watts, supra. In other words, because the actions of each tortfeasor contributed, as a "cause in fact," to produce the injury, no tortfeasor may assert that the actions of another tortfeasor, and not his own, caused the injury. The single exception to this rule is, as discussed above, where the unforeseen act of another tortfeasor, which was sufficient in and of itself to produce the injury, intervened between the time the first tortfeasor acted and the injury. In such cases, the intervening act breaks the chain of causation between the first tortfeasor's act and the injury, the first tortfeasor is relieved of his liability, and the actions of the intervening tortfeasor are considered the sole proximate cause of the injury, making the intervening tortfeasor solely liable for the entire injury. Vines, supra; Proctor, supra.
There is, of course, some evidence to support G.M.'s contention that Jarrett's collision with the Edwardses' Chevette was so severe as to have been an intervening cause which relieved it of any liability for the consequent injuries and deaths. Consequently, had G.M. requested the court to instruct the jury on the principle of intervening cause, substantially stating in the requested instruction the law as we have just outlined it, we would probably hold the trial court in error for refusing to *1196 give such an instruction; however, none of the instructions requested by G.M., with the possible exception of Request to Charge No. 32, substantially stated the legal principles of law applicable in a "crashworthiness" case. Instead, G.M.'s requested instructions merely restated the general principle of proximate cause as given by the trial court. Therefore, G.M.'s requested instructions, if given, would have added little or nothing to the proximate cause instruction already given or to the jury's understanding of proximate cause. As a result, we find that the instructions given by the trial court were adequate, and we cannot say that the trial court erred to reversal in refusing to give G.M.'s requested instructions on proximate cause.
Similarly, we perceive no reversible error in the trial court's failure to give G.M.'s requested instructions which attempted to state the elements of a "crashworthiness" cause of action. On the issue of crashworthiness, G.M. objected to the court's refusal to give the following instructions:

"REQUEST TO CHARGE NO. 22
"In order to recover in a second collision or crashworthiness case, the burden is upon plaintiff to (1) establish that the design in question was defective by offering proof of an alternative, safer design, practicable under the circumstances; (2) offer proof of what injuries, if any, would have resulted had the alternative, safe design been used; and (3) offer some method of establishing the extent of enhanced injuries attributed to the defective design.

"REQUEST TO CHARGE NO. 23
"The burden of proof is upon plaintiffs to prove what injuries, if any, would have been received had a different and safer alternative design been used and to prove the different, increased or enhanced injuries which were sustained as a result of the design which was utilized by the defendant.

"REQUEST TO CHARGE NO. 24
"I charge you, members of the jury, that the claim being made by the plaintiffs against defendant General Motors is that, in substance, alleged defects in the 1980 Chevette caused the deaths of the two Edwards children. Therefore, plaintiffs have the burden of proving to you by a preponderance of the evidence and to your reasonable satisfaction that the Edwards children would not have died except for alleged defects in the 1980 Chevette. Unless you are reasonably satisfied from the evidence that the 1980 Chevette was unreasonably dangerous and defective, and that such condition proximately and directly caused the deaths of the children, or either of them, then you cannot return a verdict against General Motors. Further, unless you are reasonably satisfied from the evidence that the children would have survived the accident but for the alleged defective condition of the Chevette, then you cannot return a verdict against General Motors. If you find that the children would not have survived the impact, or that either child would not have survived the impact, then you cannot return a verdict against General Motors as to that child or those children.

"REQUEST TO CHARGE NO. 37
"Almost every product, of whatever type or design, is capable of producing injury when put to particular uses or misuses. A manufacturer has no duty to design a product which is completely accident proof.

"REQUEST TO CHARGE NO. 45
"I charge you, members of the jury, that the law of this state does not require General Motors or any other manufacturer to produce an automobile which will protect the occupants under any conditions. In that regard, if you find that it would be unreasonable to expect the 1980 Chevette in question to protect the occupants from a collision such as the *1197 one in this case, then you must return a verdict of [sic] General Motors.

"JURY CHARGE NO. 64
"I charge you, members of the jury, that in this case brought by the Edwardses as the parents of the two deceased children, the damages recoverable, if you should find for the plaintiff, are called punitive damages. The only damages that could be awarded against either defendant in this case brought by the Edwardses on behalf of the two children are punitive damages. The measure of damages which you should apply, if you decide to award damages, should be directly related to the amount of wrongdoing on the part of the defendant. If you should be reasonably satisfied from the evidence that the Edwardses are entitled to recover for the deaths of either or both of the children against both defendants Dan Jerome Jarrett and General Motors, then the amount of the verdict as to the two defendants would not necessarily be the same. That is, your verdict against one defendant in the case of punitive damages could be more or less than the amount of your verdict against the other defendant if you are reasonably satisfied from the evidence that the degree or amount of wrongdoing by one defendant is greater than that of the other defendant. That is to say, if you are reasonably satisfied from the evidence that the degree of wrongdoing on the part of one defendant is greater than the wrongdoing on the part of the other defendant, the amounts of your verdicts against the two defendants should be different so as to reflect the difference in the degree of wrongdoing. If you should be reasonably satisfied from the evidence that the Edwardses are entitled to recover for the deaths of the two children, or either of them, and against only one defendant, then the amount of your verdict as to that one defendant should directly reflect the degree of wrongdoing of that defendant only."
These charges were either totally unacceptable, contained some unacceptable portions, were argumentative, confusing, prejudicial, or were cumulative with the instructions actually given. Specifically, requested charges 22 and 23 state the Huddell rule, which we have refused to adopt in whole; requested charge 24 was very confusing and argumentative; requested charge 37 included the term "misuses" of the product, which was not alleged here, and, therefore, was both argumentative and prejudicial; requested charge 45 used the phrase "protect the occupants under any conditions," which was incorrect considering that under foreseeable conditions the automobile should protect its occupants from injury (the charge should have used the phrase "all conditions"); and, requested charge 64 improperly states that punitive damages are apportionable. We cannot hold the trial court in error for not giving them. Therefore, we will not reverse based upon the trial court's jury instructions.
G.M. has no grounds for arguing that the verdicts exonerating Jarrett while finding it solely liable are inconsistent. Had Jarrett been found guilty of negligence, he would have been no more than a joint tortfeasor, whose negligence would in no way have relieved G.M. of its several liability. Consequently, G.M. cannot complain. Atlantic Coast Line R. Co. v. Carroll, 208 Ala. 361, 94 So. 820 (1922).
As to the other issues raised by G.M., relating to the admissibility of certain evidence, the propriety of plaintiffs' closing argument, and alleged juror misconduct, we find no reversible error.
In conclusion, we would make two observations: First, in researching this case, we have noted that in almost all "crashworthiness" cases, trial courts have, rather than submitting general verdict forms to the jury, also submitted interrogatories accompanying verdict forms. Such a procedure is provided for by Rule 49(c), Ala.R.Civ.P. Although we cannot require trial courts to submit such interrogatories, *1198 we believe that they would be most helpful in all "crashworthiness" cases.
Finally, we note that federal safety standards, such as the National Traffic and Motor Vehicle Safety Act of 1966, and the regulations promulgated pursuant thereto, do not preempt or prohibit suits, like the present one, brought in state court under common law causes of action. In fact, proof of compliance with federal highway safety standards, while it may be admitted as evidence that a vehicle is not defective, is not conclusive and, therefore, does not provide a defense to state law claims. As a result, juries, like the one in this case, are charged with the awesome responsibility of deciding, on a case by case basis, the reasonableness of an automobile's design. Such complex decisions, which must be made upon the limited information made available to the jurors within the constraints of the judicial system, have potential national implications. We could hold that the standards set by the federal government, which has the resources necessary to conduct tests to determine whether or not a design is unreasonably dangerous, are conclusive. We refuse to so hold. Whether federal standards should be conclusive in "crashworthiness" cases is not a decision for this Court to make. Such a decision, if made, would have to be made by the appropriate legislative body.

II
We now discuss the trial court's order granting remittitur.
As stated in this opinion earlier, the trial court, acting pursuant to General Motors' motion, remitted each wrongful death award by $600,000, down to $1,400,000.
Remittitur has been recognized in Alabama for many years as a legitimate device to end litigation. Rule 59(f), Ala.R.Civ.P., promulgated by this Court, expressly provides that "[t]he [trial] court may, on motion for new trial, require a remittitur as a condition to the overruling of the motion for new trial ...," but provides that "the acceptance of [the] remittitur by the plaintiff shall not prejudice his right to raise, on appeal by the defendant, his right to have the verdict reinstated in its full amount." This Court is also independently authorized to require remittitur in an appropriate case. Code 1975, § 12-22-71, provides:
"When an appeal is taken to the appropriate appellate court from the judgment of any court and the appellate court shall be of the opinion that the case should be reversed because the judgment of the lower court is excessive and that there is no other ground of reversal, the appellate court shall notify the appellee of the amount which it deems in excess of the just and proper amount of recovery and require the appellee, within a time to be stated in said notice, to remit such amount upon penalty of a reversal of the case. If the appellee does not, within the time stated in such notice or within such further time as may be granted by the court for good reason file a remittitur of such excessive amount, the appellate court shall reverse and remand the case; but, if the appellee shall file with the court a remittitur of the amount deemed excessive by the court, the appellate court shall reduce the amount of the judgment accordingly and shall affirm the case and enter a judgment for such reduced amount, which judgment so entered shall be and remain the judgment of the lower court and shall date back to the time of the entry or rendition of the judgment in the lower court."
In various cases, this Court has generally followed the principle that a trial court is accorded a large measure of discretion in determining whether to grant a remittitur. Todd v. United Steelworkers of America, 441 So.2d 889, 892 (Ala.1983). We have also generally held that when a trial court exercises its discretion to order a remittitur, its decision is presumed correct and will not be reversed on appeal absent evidence of an abuse of discretion. Id.
Illustrative of the action this Court has taken in cases involving claims of excessive judgments, are the following:
*1199 The trial court ordered remittitur, and this Court affirmed: Todd v. United Steelworkers of America, AFL-CIO, 441 So.2d 889 (Ala.1983); Winchester v. McCulloch Brothers Garage, Inc., 388 So.2d 927 (Ala. 1980); International Resorts, Inc. v. Lambert, 350 So.2d 391 (Ala.1977); Stead v. Blue Cross-Blue Shield of Alabama, 346 So.2d 1140 (Ala.1977); Taylor v. Birmingham News Co., 341 So.2d 689 (Ala.1977); Holcombe v. Whitaker, 294 Ala. 430, 318 So.2d 289 (1975).
The trial court ordered remittitur and this Court reversed: Shiloh Construction Co. v. Mercury Construction Corp., 392 So.2d 809 (Ala.1980); B & M Homes, Inc. v. Hogan, 376 So.2d 667 (Ala.1979); Alabama Farm Bureau Mutual Casualty Insurance Co. v. Guthrie, 338 So.2d 1276 (Ala. 1976).
The trial court refused to grant remittitur and this Court affirmed: American Pioneer Life Insurance Co. v. Sandlin, 470 So.2d 657 (Ala.1985); White v. Fridge, 461 So.2d 793 (Ala.1984).
The trial court refused to grant remittitur and this Court reversed: Coca-Cola Bottling Co., Montgomery v. Parker, 451 So.2d 786 (Ala.1984); Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916 (Ala.1981); General Electric Credit Corp. v. Alford & Associates, Inc., 374 So.2d 1316 (Ala.1979); San-Ann Service Inc. v. Bedingfield, 293 Ala. 469, 305 So.2d 374 (1974); Foodtown Stores, Inc. v. Patterson, 282 Ala. 477, 213 So.2d 211 (1968).
As can readily be seen by a review of these cases, this Court has not yet adopted specific standards for courts to apply in granting or denying remittitur. We believe that the time has come for this Court to study the remittitur practice in Alabama, and to adopt a rule or rules of practice which would ensure the protection of the jury system and the parties' right to a jury trial, but which would also protect the public's interest in decreased court costs and a speedy and just determination of every case upon the merits. We do not adopt those standards in this case, because to do so would effect a major change in current remittitur practice, and such a major change should be adopted only after adequate notice and deliberate study by the full Court.[5]
The Court considered the possibility of remanding this cause to the trial court, with directions, to require the trial judge to state what may have induced the verdicts which he found to be excessive, but we are convinced that present law does not require that the trial judge state any reasons why he granted remittitur. In Williams v. Williams, 283 Ala. 292, 295, 216 So.2d 181, 183 (1968), this Court held:
"The amount of damages awarded in the verdict and judgment, in the light of the facts disclosed by the evidence, often furnishes the determining data. Sturdivant v. Crawford et al., 240 Ala. 383, 199 So. 537. Where a court concludes that damages are inadequate, or excessive, it is not necessary that it declare what may have induced a wrongful award in the amount of damages assessed."
Applying this principle, we believe a remand would not be appropriate. This Court has long recognized that appellate review of remittitur "involves a review of [the] trial court's judgment based upon his observation of all the witnesses who testified in the case and other incidents of the trial which cannot be reflected in the transcript and which are not available for observation by us." Airheart v. Green, 267 Ala. 689, 693, 104 So.2d 687, 690 (1958).
In Airheart, this Court did conclude that in a case involving our homicide statute, as this case does, "the amount of the verdict and the severity of the punishment are graded according to the degree of culpability...." 267 Ala. at 693, 104 So.2d at 691. The trial judge very well may have applied the Airheart rule in this case.
For an excellent discussion of the subject of remittitur in Alabama, see Commentary, *1200 Remittitur Practice in Alabama, 34 Ala. L.Rev. 275 (1983).
Based on the foregoing, we are of the opinion that the judgment of the trial court on the cross-appeal, is due to be affirmed.
AFFIRMED AS TO BOTH APPEAL AND CROSS-APPEAL.
As to Part I, all Justices concur, except SHORES and HOUSTON, JJ., recused.
As to Part II, TORBERT, C.J., and BEATTY and ADAMS, JJ., concur; FAULKNER, JONES and ALMON, JJ., dissent; SHORES and HOUSTON, JJ., recused.
ALMON, Justice (dissenting as to part II).
I would not affirm the trial court's judgment granting remittitur on the record presented in this case. In cases such as this, where the amount of damages is within the sound discretion of the jury, a remittitur should be granted only "where the court can clearly see that the verdict has been reached on account of bias, passion, prejudice, corruption, or other improper motive or cause." Carlisle v. Miller, 275 Ala. 440, 444, 155 So.2d 689, 692 (1963); Caterpillar Tractor Co. v. Ford, 406 So.2d 854 (Ala.1981). The trial court, in its order granting remittitur or new trial, made no such finding of bias or passion; indeed, it made no findings to support this portion of its judgment at all.
This Court, in addressing the issue of remittitur of large punitive damages verdicts, should develop standards by which motions for remittitur or new trial should be decided. The Court has affirmed judgments on large verdicts with substantial punitive damages components. Without standards, there is no objective way of determining when a verdict has been influenced by bias or passion. The constitutional right to jury trial is then within the trial court's power, subject to review governed only by the vague criterion of "abuse of discretion."
The purposes of punitive damages is to punish and deter wrongdoing. The nature of the wrong and the wealth of the defendant are pertinent to the decision on the amount necessary to punish the wrongdoer. Because the jury should not consider the wealth of the defendant, it would be proper for the trial court to consider such matters in a post-trial hearing on the motion for new trial or remittitur. In such a situation, the burden would be on the party seeking to set aside the verdict to show why the damages were excessive and/or unreasonably punitive.
In the instant case, it is difficult to see by what standard the trial court granted the remittitur. This Court has allowed similar large verdicts to stand. Surely the wrong of knowingly designing a defective car is at least as great as the wrong of a bad faith refusal to pay an insurance claim. The plaintiffs' children were killed in this crash, whereas the plaintiffs in bad faith cases suffer less cataclysmic wrongs. General Motors is one of the largest corporations in the world, and surely an amount appropriate to punish its wrongdoing is no less than an amount necessary to punish a large insurance company.
I make these remarks only as general observations. Because the majority of the Court does not agree with me that in this case we should begin the process of establishing standards, I have not done the extensive research necessary to that task. The jury awarded damages commensurate with damages which we have affirmed in other cases. If we are now deciding that those damages are too high, we should do so in a reasoned manner. Absent such a determination, I would reverse that portion of the judgment granting remittitur.
FAULKNER and JONES, JJ., concur.
NOTES
[1] Jarrett admitted to having had four beers prior to the collision. A blood alcohol test conducted over one hour after the accident placed his blood alcohol level at .104%, above the legal limit of intoxication set at .10% by Code 1975, § 32-5A-191.
[2] In Atkins, as here, an automobile's gasoline tank exploded during a rear-end collision. This Court held that an A.E.M.L.D. claim existed against the manufacturer of the automobile.
[3] Not only is apportionment not allowed, but the evidence required by Huddell to support it would be, at best, speculative. As was stated in Lahocki v. Contee Sand & Gravel Co., 41 Md. App. 579, 398 A.2d 490 (1979), reversed on other grounds, 286 Md. 714, 410 A.2d 1039 (1980):

"We begin our departure from G.M.'s reasoning when it points to Huddell v. Levin, 537 F.2d 726 (3rd Cir.1976), for the premise that the plaintiff not only must prove that his injury was enhanced by the defect attributable to G.M., but also must specifically set forth what precise injuries would have occurred absent the defect.
"* * * *
"To state such a premise in this case points to its absurdity unless a plaintiff's experts could qualify as soothsayers." 41 Md.App. at 590, 398 A.2d at 498.
[4] We note the trial court's failure to instruct as to intervening cause was due to the fact that the pattern jury instructions contain no such instruction. In fact, the Notes On Use accompanying A.P.J.I:Civ. §§ 33.02, 33.03 recommend that no such instructions be given. This recommendation results from the belief of the committee which drafted these instructions that the concept of intervening cause is so beyond the comprehension of most jurors that, in the ordinary case, giving such an instruction would only confuse the jury and hinder the cause of justice. See Notes on Use, A.P.J.I:Civ. §§ 33.02, 33.03; see also, Prescott v. Martin, supra, n. 1, at 244.

Even though we agree that in the normal case, such as where a single tortfeasor is involved or the proximate cause of the injuries in question is otherwise clear, the chance of confusion might otherwise outweigh the value of giving a charge on intervening cause, we believe that under certain facts, such a charge should be given in crashworthiness cases, if properly framed and requested by a party.
[5] Justices Shores and Houston are recused in this case.